UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DISTRICT

| | |
|---|---|
| ANDREW BEHAR, DERIVATIVELY ON BEHALF OF FIRSTENERGY CORP., <br><br> Plaintiff, <br><br> vs. <br><br> MICHAEL J. ANDERSON, STEVEN J. DEMETRIOU, JULIA L. JOHNSON, CHARLES E. JONES, DONALD T. MISHEFF, THOMAS N. MITCHELL, JAMES F. O'NEIL, III, CHRISTOPHER D. PAPPAS, SANDRA PIANALTO, LUIS A. REYES, LESLIE M. TURNER, JAMES F. PEARSON, STEVEN E. STRAH, EBONY L. YEBOAH-AMANKWAH, AND K. JON TAYLOR, <br><br> Defendants, <br><br> and FIRSTENERGY CORP., <br><br> Nominal Defendant. | Case No.: <br><br><br> JURY TRIAL DEMANDED |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1.      Plaintiff Andrew Behar ("Plaintiff"), a shareholder of FirstEnergy Corp. ("FirstEnergy" the "Company"), brings this shareholder derivative action on behalf of FirstEnergy against the Company's current officers and directors identified below (collectively, "Defendants") for breaches of fiduciary duties and violations of state and federal law during the period of January 1, 2017, through the present (the "Relevant Period").

2.     Plaintiff alleges the following upon personal knowledge as to himself[1] and as to all other matters, upon information and belief, including investigation of counsel, which included, among other things: allegations by state and federal authorities in connection with the wrongdoing and illegal conduct alleged in this action and the criminal indictments arising therefrom, including filings in *USA v. Householder, et. al.,* 1:20-cr-00077-TSB (S.D. Ohio) ("FBI Complaint"); filings by FirstEnergy with the U.S. Securities and Exchange Commission ("SEC"); media reports; analyst reports regarding FirstEnergy; and company publications and information such as press releases, shareholder communications, conference calls and postings on the Company's websites.

3.     On July 21, 2020, Larry Householder ("Householder"), Speaker of the Ohio House of Representatives, was arrested and charged by the U.S. Attorney for the Southern District of Ohio. Following the filing of the FBI Complaint against Householder and others and reports of FirstEnergy's involvement in the misconduct, the Company's stock plummeted, eliminating more than $7 billion in market capitalization in a matter of days. FirstEnergy itself is the subject of civil investigations by the U.S. Department of Justice ("DOJ"), the Securities and Exchange Commission ("SEC"), the Ohio Public Utilities Commission ("OPUC"), and the Ohio State Attorney General.  FirstEnergy has been harmed as a result of this bribery scandal.

4.     Defendants' misconduct began in late 2016.   FirstEnergy was then dealing with two struggling nuclear power plants, diminishing demand for nuclear energy, and increasing maintenance costs for the plants.

---

[1]     Verification attached hereto as Exhibit A.

5.     At that same time, Householder was seeking to re-enter Ohio politics, having resigned in disgrace from the Speakership in 2004 amid accusations that he had accepted kickbacks from vendors and traded legislation for campaign contributions. Nevertheless, Householder was elected to the Ohio House of Representatives in November 2016, and within days after taking office on January 3, 2017, FirstEnergy flew Householder on the Company's private jet to Washington, D.C. to attend the presidential inauguration. Then, in March 2017 – only two months after that trip – FirstEnergy and its subsidiaries made the first of a series of $250,000 quarterly payments to a 501(c)(4) entity called "Generation Now," a Householder-controlled entity described by one co-conspirator as structured to allow "donors" to "give as much or more to the (c)(4) and nobody would ever know."

6.     From that point forward, FirstEnergy and its subsidiaries paid tens of millions of dollars – under the guise of donations – to various entities controlled by Householder to support Householder's bid for Speaker of the House, to support other Ohio House candidates that FirstEnergy and Householder believed would support Householder's candidacy, and for Householder's personal use. This scheme was ultimately successful: Householder was re-elected as Speaker of the House in January 2019, and shortly thereafter, the criminal conspiracy's ultimate aim was accomplished as House Bill 6 ("HB6") was introduced in the Ohio state legislature in early 2019.  HB6 provided a massive $1.3 billion "bailout" to FirstEnergy's failing power plants. HB6 passed in July 2019 and Ohio Governor Mike DeWine signed the bill into law.

7.     The public protested this new law and HB6 faced a statewide ballot referendum seeking to repeal it – which FirstEnergy vehemently opposed. FirstEnergy then funneled an additional $38 million in the span of just a few short months to oppose the initiative and bribed an employee of a signature collection firm to sabotage it. FirstEnergy's efforts paid off, and the

3

referendum was defeated. All told, in just under three years, FirstEnergy paid a total of ***$61 million*** in bribes and illegal campaign contributions to secure the HB6 legislation.

8.     One year after HB6 was signed into law, the public learned how FirstEnergy was able to secure the legislation. On July 17, 2020, the U.S. Attorney for the Southern District of Ohio filed an 80-page FBI Complaint against Householder, two of FirstEnergy's lobbyists, and members of Householder's staff. In announcing the Criminal Complaint and indictments, U.S. Attorney David DeVillers stated that "[t]his is likely the largest bribery, money laundering scheme ever perpetrated against the people of the state of Ohio."

9.     Although the FBI Complaint referenced a "Company A," it was widely acknowledged that "Company A" was FirstEnergy. In fact, DeVillers all but confirmed FirstEnergy's direct involvement, stating: "Company A provided $60 million in return for the $1.3 billion bailout. Everyone in this room knows who Company A is." While DeVillers noted that "no one from the Company has of yet been charged," he added that "there are going to be a lot of busy FBI agents in the Southern District of Ohio . . . this is by no means over."

10.     The FBI Complaint detailed the bribery scheme step-by-step, including the fact that Defendants either knew of and participated in the fraud, or willfully disregarded the significant and pervasive red flags that should have alerted them to it. The FBI Complaint directly implicated FirstEnergy and Defendants through detailed transcripts of phone calls, recorded conversations, call logs, text messages, meeting minutes, and bank records, among other facts. The FBI Complaint documented over 200 phone calls between senior FirstEnergy executives and Householder during the Relevant Period, including at least 84 calls with FirstEnergy CEO and Director, Defendant Charles E. Jones ("Jones"), as well as a meeting where Defendant Jones and other "Company brass" discussed defeating the HB6 ballot referendum. Additionally, virtually all of the funds wired to

4

Householder and his cohorts were effectuated through FirstEnergy Service Company, a subsidiary that was under the control and management of CEO Jones.

11.     In addition, Defendants consciously ignored pervasive and obvious red flags for years concerning the criminal conduct and the Company's ties to Householder, including persistent and widespread public scrutiny over Householder's past corruption, which, though widely reported throughout Ohio, did not stop Defendants from seeking out Householder's assistance in securing the passage of HB6. Similarly, one of the lobbyists that FirstEnergy assigned to serve as a key middleman in the scheme, Matthew Borges—who would also later be indicted alongside Householder—had also pled guilty for illegal campaign contributions in a similar public pay-to play scandal in 2004. Borges would later describe the convergence of FirstEnergy, Householder, and Borges' firm as an "unholy alliance."

12.     Moreover, throughout the Relevant Period, media articles, investigative journalists and public sector watchdogs repeatedly questioned the propriety of FirstEnergy's ties to Householder. As early as 2017, media reports described FirstEnergy's relationship with Householder as "cozy" and "warm," and a March 2017 *Dayton Daily News* article highlighted Householder's history of alleged kickbacks and juxtaposed those past allegations with his suspicious trip aboard FirstEnergy's corporate jet in January 2017. In April 2018, a *Cleveland.com* article questioned the "big checks" that FirstEnergy was providing to Householder and his allies, asking "why FirstEnergy decided to put so much money behind Team Householder."

13.     Public scrutiny of FirstEnergy only intensified as HB6 was introduced and passed. Indeed, media reports made the direct connection between the "unprecedented" amount of money being spent in the effort to pass HB6 and FirstEnergy's direct interest in the bill. For instance, an Ohio energy watchdog group, Common Cause Ohio, released a report entitled "Connecting the

5

Dots: FirstEnergy Political $$$, Profits, and Utility Policy." The report emphasized FirstEnergy's ties to Householder-related travel, lobbying and "secret money"; directly linked FirstEnergy's contributions and various Householder-affiliated "dark money" groups listing Generation Now as a donor; and highlighted the fact that the Company "spent big to elect candidates—then got favorable policies in return," including "taxpayer [funded] bailouts and rollbacks of energy efficiency standards." Significantly, the report directly asked the question that Defendants should have explored and redressed years earlier: "whether FirstEnergy is using secret money to build public pressure this year." Similarly, an article published in the *Cincinnati Enquirer* on July 2, 2019 asked, "Who paid all that money to buy all those nuclear bailout ads raining on Ohio?" The article quoted Householder as saying that the "working men and women from Ohio" paid for the advertisements. Despite the prevalence of these media reports and the persistent questions being asked by investigative journalists, Defendants utterly failed to take any tangible action to address and correct the criminal misconduct.

14.     Furthermore, Defendants' failure to heed these obvious warning signs was even more conspicuous given the fact that the FirstEnergy Board of Directors had repeatedly defeated shareholder proxy proposals directly aimed at enhancing transparency and accountability. For instance, in April 2015, a shareholder proposal raised concerns to the Board regarding FirstEnergy's "decision-making process and oversight mechanisms for making lobbying contributions." A May 2016 proposal also identified the Board's oversight deficiencies, stating that "FirstEnergy previously committed to greater transparency around its political spending . . .but has not fulfilled its commitment." In March 2017—the same month that FirstEnergy provided the first $250,000 bribe to Householder—a shareholder proposal warned that "FirstEnergy's current lack of trade association disclosure presents reputational risk. Absent a system of accountability,

company assets could be used for objectives contrary to FirstEnergy's long-term interests."
Despite these vociferous and repeated shareholder warnings, the proxy proposals were all defeated
at the behest of the Board's recommendations. It was only in late October 2020 following the
guilty plea of 2 participants in the scandal to RICO conspiracy charges that Defendant Jones was
terminated by the Company as were senior executives Dennis M. Chack and Michael J. Dowling.
The Company then also parted ways with its chief legal officer, Robert Reffner, and general
counsel and ethics chief, Ebony L. Yeboah – Amankwah.

15.     Defendants willfully and repeatedly breached their fiduciary duties of care and
loyalty to FirstEnergy and its shareholders, and consequently, the Company has suffered enormous
damage, including civil and criminal penalties and fines. Defendants are liable to FirstEnergy for
breaches of their fiduciary duties, violations of Section 14(a) of the Securities Exchange Act of
1934 (the "Exchange Act"), and violations of state law. Accordingly, Defendants face a
substantial likelihood of liability for their misconduct such that they cannot make an objective
decision to bring claims for damages that they have caused to the Company.

## I.      JURISDICTION AND VENUE

16.     The claims asserted in this action arise in part under Section 14(a) of the
Exchange Act, 15 U.S.C. § 78n(a), and SEC regulation 14a-9 promulgated thereunder, as well as
Section 10(b) of the Exchange Act. This Court possesses jurisdiction pursuant to 28 U.S.C. § 1331
(federal question jurisdiction) and 28 U.S.C. § 1367(a) (supplemental jurisdiction over state law
claims).

17.     This action is not a collusive one to manufacture jurisdiction that the
Court otherwise would not have.

18.     Venue is proper in this Court because the events, acts, omissions, and false statements underlying Plaintiff's claims occurred in substantial part in this District, and FirstEnergy has suffered and will continue to suffer harm in this District. Cases pending in this District that arise from the harm alleged here include: (i) the Criminal Complaint; (ii) a number of class action complaints alleging violations of the federal securities laws; (iii) civil litigation against the Company for the complained of scheme by Ohio ratepayers; and (iv) shareholder derivative actions.

19.     The Court has jurisdiction over each named defendant because such defendants are individuals who have sufficient minimum contacts with Ohio so as to render the exercise of jurisdiction by the Court permissible.

## II.     PARTIES

### A.     Plaintiff.

20.     Plaintiff Andrew Behar has owned the common stock of FirstEnergy since 2011 and has continuously held FirstEnergy common stock through the Relevant Period. Plaintiff brings this action derivatively on behalf of FirstEnergy and its stockholders to redress injuries that the corporation suffered, and will suffer, as a direct result of Defendants' misconduct. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in this litigation.

### B.     Nominal Defendant.

21.     Nominal Defendant FirstEnergy, an Ohio corporation headquartered at 76 South Main Street, Akron, Ohio 44308, is one of the largest investor-owned utility companies. Its principal business is the distribution, transmission, and generation of electricity, as well as energy management and other related services. The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "FE."

8

C.    **The Individual Defendants.**

1.    **The Director Defendants.**

22.    Defendant Michael J. Anderson ("Anderson") has served on the Company's Board since 2007, and presently chairs the Audit Committee and is a member of the Finance Committee. From at least 2016 through 2019, Anderson also served on the Corporate Governance and Corporate Responsibility Committee. From 2016 to 2019, Anderson was awarded $1,031,757 in fees, stock awards, and other compensation for his service on the Board.

23.    Defendant Steven J. Demetriou ("Demetriou") has served on the Company's Board since 2017 and is a member of the Finance Committee and the Operations, Safety and Nuclear Oversight Committee. Demetriou served on the Compensation Committee from 2018 through 2019. From 2017 through 2019, Demetriou was given $704,538 in fees, stock awards, and other compensation for his service on the Board.

24.    Defendant Julia L. Johnson ("Johnson") has served on the Company's Board since 2011. Johnson chairs the Corporate Governance and Corporate Responsibility Committee and serves as a member of the Finance Committee. From 2016 through 2019, Johnson was given $953,825 in fees, stock awards, and other compensation for her service on the Board.

25.    Defendant Charles E. Jones ("Jones") served on the Company's Board and as Chief Executive Officer ("CEO") of FirstEnergy since 2015 until his termination in October 2020. Since at least 1978, Jones has worked in various management positions with the Company or its subsidiaries. From 2016 to 2019, Jones's total compensation (including base salary, stock options, etc.) comprised $55,207,422. Jones is also a named defendant in multiple lawsuits filed in the Southern District of Ohio alleging violations of the federal securities laws ("the Securities Class Actions").

9

26.     Defendant Donald T. Misheff ("Misheff") has served on the Company's Board since 2012. He has been the Non-executive Chairman of the FirstEnergy Board since May 2018 and is also a member of the Audit and Corporate Governance and Corporate Responsibility Committees. Misheff served on the Compensation Committee from 2016 through 2018. From 2016 to 2019, Misheff was given $1,224,230 in fees, stock awards, and other compensation for his service on the Board.

27.     Defendant Thomas N. Mitchell ("Mitchell") has served on the Company's Board since 2016. Mitchell chairs the Operations, Safety and Nuclear Oversight Committee and is a member of the Corporate Governance and Corporate Responsibility Committee. From 2016 to 2019, Mitchell was given $978,193 in fees, stock awards, and other compensation for his service on the Board.

28.     Defendant James F. O'Neil, III ("O'Neil") has served on the Company's Board since 2017. O'Neil chairs the Compensation Committee and serves as a member of the Operations, Safety and Nuclear Oversight Committee. He was also on the Audit Committee from May 2017 to May 2019. From 2017 through 2019, O'Neil was given $739,825 in fees, stock awards, and other compensation for his service on the Board.

29.     Defendant Christopher D. Pappas ("Pappas") has served on the Company's Board since 2011. Pappas chairs the Finance Committee and serves as a member of the Compensation Committee. From 2016 through 2019, Pappas was given $1,009,482 in fees, stock awards, and other compensation for his service on the Board.

30.     Defendant Sandra Pianalto ("Pianalto") has served on the Company's Board since 2018. Pianalto is a member of the Compensation and Audit Committees and also served on the

Finance Committee from 2018 through 2019. From 2018 through 2019, Pianalto was given $452,838 in fees, stock awards, and other compensation for her service on the Board.

31. Defendant Luis A. Reyes ("Reyes") has served on the Company's Board since 2013. Reyes is a member of the Corporate Governance and Corporate Responsibility Committee and Operations, Safety and Nuclear Oversight Committee. From 2016 to 2019, Reyes was given $948,601 in fees, stock awards, and other compensation for his service on the Board.

32. Defendant Leslie M. Turner ("Turner") has served on the Company's Board since 2018 and serves as a member of the Audit and Compensation Committees. From 2018 through 2019, Turner was given $314,836 in fees, stock awards, and other compensation for her service on the Board.

33. Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner are collectively referred to herein as the "Director Defendants."

### 2. The Officer Defendants.

34. Defendant James F. Pearson ("Pearson") served as FirstEnergy's CFO from 2013 until March 2018. From March 2018 until his April 2019 retirement, Pearson served as Vice President of Finance. Since at least 1976, he held a number of positions with the Company or its subsidiaries, including in management. From 2016 to 2019, Pearson's total compensation was $22,803,462. Pearson is a named defendant in the Securities Class Actions.

35. Defendant Steven E. Strah ("Strah") is the President of FirstEnergy. Prior to becoming President in May 2020, Strah previously had served as FirstEnergy's Chief Financial Officer ("CFO") starting March 2018. Before March 2018, Strah served as Senior Vice President of FirstEnergy's Utilities Operations. He previously held various positions with the Company or

its subsidiaries, since at least 1984, including a variety of management and senior management positions. From 2016 to 2019, Strah's total compensation was $16,848,974. Strah is a named defendant in the Securities Class Action.

36.     Defendant Ebony L. Yeboah-Amankwah ("Yeboah-Amankwah"), was FirstEnergy's Vice President, Corporate Secretary & Chief Ethics Officer during the Relevant Period. Defendant Yeboah-Amankwah signed the 2018 Proxy, the 2019 Proxy, and the 2020 Proxy, as detailed herein. Yeboah-Amankwah recently "separated" from the Company.

37.     Defendant K. Jon Taylor ("Taylor") is presently the Company's CFO. Prior to following Strah into the CFO position, he was the Company's Controller and Chief Accounting Officer until March 2018, after which time he became President of FirstEnergy's Ohio Operations and, in 2019, Vice President of Utilities Operations. Taylor joined FirstEnergy in 2009 and progressed through various senior level financial positions. Taylor is named as a defendant in the Securities Class Action.

38.     Defendants Jones, Pearson, Strah, Yeboah-Amankwah, and Taylor are collectively referred to as the "Officer Defendants."

39.     Defendants Anderson, Biltz, Demetriou, Johnson, Misheff, Mitchell, O'Neil, Pappas, Pearson, Pianalto, Reyes, Turner, Strah, Taylor, and Turner are collectively referred to herein as the "Individual Defendants."

**D.     Relevant Non-Parties**

40.     Larry Householder has been a member of the Ohio House of Representatives since January 2017 and was Speaker of the House from January 2019 until his removal on July 30, 2020.  Householder previously was a House member representing Ohio's 72nd District from 1997 to  2004 and served as Ohio Speaker of the House from 2001 to 2004, before resigning after

12

reports of alleged corrupt activity surfaced in the media and were publicly referred to the FBI. Householder personally benefitted from FirstEnergy.

41.     Generation Now ("Generation Now") is a registered tax-exempt social welfare organization under Section 501(c)(4) of the Internal Revenue Code. From 2017 to the present, Generation Now received approximately $60 million from FirstEnergy and affiliates.

42.     Matthew Borges ("Borges") is a registered lobbyist for FirstEnergy Solutions ("FES"), a FirstEnergy subsidiary. The FBI Complaint alleges that Borges received $1.62 million in wire transfers from Generation Now. Borges diverted over $350,000 of the Generation Now payments from FirstEnergy to himself.

43.     Juan Cespedes ("Cespedes") is a lobbyist retained by FES, the listed "lead consultant" seeking legislation that would save FES's failing Nuclear Power Plants. The FBI affidavit has alleged that Cespedes "was in regular contact with both [FirstEnergy] and Enterprise members during the relevant period" and that toll records and search warrant returns reveal that "Cespedes coordinated the timely payment of $15 million from [FirstEnergy] to Generation Now." Cespedes received $227,000 from FirstEnergy in 2019 and approximately $600,000 from the Enterprise (defined herein). Cespedes was indicted and in October 2020 entered into a plea agreement with the U.S. Attorney's Office under which Cespedes would plead guilty to RICO conspiracy charges and agree to cooperate in the case.

44.     Jeffrey Longstreth ("Longstreth") is Householder's longtime campaign and political strategist. According to the Criminal Complaint, "Longstreth led the messaging efforts both in the campaign to pass HB 6 and to defeat the referendum, and was a point of contact for [FirstEnergy]." $5 million went from FirstEnergy to Longstreth, including at least $1 million that he transferred to his brokerage account in January 2020. Longstreth was indicted and in October

2020 entered into a plea agreement with the U.S. Attorney's Office under which Longstreth would plead guilty to RICO conspiracy charges and agree to cooperate in the case.

45.     Neil Clark ("Clark") is a professional lobbyist. Clark owns Grant Street Consultants and previously served as a budget director for the Ohio Republican Caucus. Clark served as Householder's "'proxy' relating to [FirstEnergy's] matters" and in the Enterprise's efforts to further the enactment of HB 6 and ensure HB 6 went into effect in October 2019 by defeating the subsequent ballot-initiative challenge. Clark referred to FirstEnergy as the Enterprise's "Bank," and stated that the Company's "deep pockets" provided "unlimited" funds. Clark received at least $290,000 from FirstEnergy funds.

46.     The FBI Affidavit refers to Borges, Cespedes, Clark, Householder, Longstreth, and Generation Now together as the "Enterprise," which was engaged in illegal racketeering.

## III.     FIRSTENERGY'S BACKGROUND

### A.     FirstEnergy's History of Corporate Governance and Oversight Failures.

47.     FirstEnergy is a utility company incorporated under the law of Ohio that generates, transmits, and distributes electricity through its subsidiaries and affiliates. It is one of the nation's largest investor-owned electric utilities, serving customers throughout Ohio, Pennsylvania, West Virginia, Maryland, New Jersey, and New York.

48.     FirstEnergy also owns and operates FirstEnergy Service Co. ("FESC"), a subsidiary that provides legal, financial, and other corporate support to its affiliated companies. FESC does not have its own CEO or board of directors, and was under the control and management of FirstEnergy and Defendants at all times during the Relevant Period.

49.     The Board has five committees: the Audit Committee; the Compensation Committee; the Corporate Governance and Corporate Responsibility Committee; the Finance Committee, and; the Operations, Safety and Nuclear Oversight Committee.

50.     During the Relevant Period, FirstEnergy had a business segment known as Competitive Energy Services ("CES"). CES itself was primarily comprised of three legal entities: FirstEnergy Solutions ("FES"), FirstEnergy Nuclear Operating Co. ("FENOC"), and Allegheny Energy Supply. Through FES and FENOC, FirstEnergy owned, operated, and maintained two nuclear power plants in Ohio: the Perry Nuclear Generating Station (the "Perry Plant") and the Davis-Besse Nuclear Power Station (the "Davis-Besse Plant")—the two plants at the heart of the bribery scheme. Among the shared services FESC provided to FES were "external affairs," including "corporate contributions," "Federal/State/Local Regulatory Affairs," and "advocacy at the Federal, State, and Local Levels.

51.     Since at least 2003, FirstEnergy's long history of major corporate governance and oversight failures have subjected the Company to tens of millions of dollars' worth of liability for its repeated violations of shareholder and public trust. For example, in 2003, a derivative action was brought against the Company's Board for breaches of fiduciary duty – specifically, ignoring repeated signs of equipment deficiencies at the Davis-Besse Plant and failing to maintain emergency control systems – which resulted in a serious nuclear plant incident and the largest electrical blackout in United States history, leading to nearly 100 deaths and resulting in hundreds of millions of dollars in damages and remedial costs.

52.     Additionally, in 2004, it was revealed that FirstEnergy bribed Robert Tongren, then-Executive Director of Ohio's Office of Consumers' Counsel, in exchange for Tongren's interference with an unpublished consultant report. The destroyed report disputed FirstEnergy's

15

claim to recoup up to $8.8 billion from ratepayers for its nuclear power plants in Ohio, finding instead that the appropriate amount was between $2.2 billion and $4 billion. The relationship between FirstEnergy and Tongren eventually came to light and Tongren resigned under pressure from state officials and consumer groups.

53.     In 2006, FirstEnergy entered into a deferred prosecution agreement – which included a "full admission of responsibility" – for lying to the Nuclear Regulatory Commission about the dangerous conditions at FirstEnergy's Davis-Besse Plant. The Company paid a record $28 million fine for safety violations.

54.     Defendants knew, at the start of the Relevant Period, that FirstEnergy suffered from a history of corporate governance and oversight failures that had the potential to cause massive damages to the Company and its shareholders.

**B.      The Director Defendants Consciously Ignored Persistent and Pervasive Red Flags as the Bribery Scheme Unfolded.**

55.     By 2016, due to weakening demand for electricity and historically low prices in wholesale energy markets, FirstEnergy's nuclear generation operation had become financially unsustainable. In its 2016 Form 10-K, FirstEnergy recorded a non-case pre-tax impairment charge of $800 million, recognized in the second quarter of 2016, "representing the total amount of goodwill at CES." In light of this write-down and the Company's inability to profitably compete in the nuclear electricity generation market, FirstEnergy announced in the 2016 Form 10-K:

> Although FirstEnergy is targeting mid-2018 to exit from competitive
> operations, the options for the remaining portion of CES' generation are still
> uncertain, but could include . . . Legislative or regulatory solutions for generation
> assets that recognize their environmental or energy security benefits[.]

56.    On the Company's earnings call the next day, February 22, 2017, Jones expanded on the "legislative solution" FirstEnergy was considering for the Perry and Davis-Besse Plants: a bailout, sponsored by the state of Ohio. Jones explained:

> In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security. . . . We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that FirstEnergy won't be the long-term owner of these assets. We are optimistic, given these discussions we have had so far and we will keep you posted as this process unfolds.

57.    Additionally, Jones discussed FirstEnergy's continued support of FES (and its subsidiary FirstEnergy Nuclear Generation) and its efforts to obtain subsidies:

> In addition to the $500 million credit facility provided to FES by FirstEnergy that provides for ordinary operating liquidity needs, FirstEnergy is now working with FES to establish conditional credit support on terms and conditions to be agreed upon for the $400 million FES parental support agreement that is currently in place, benefiting FE Nuclear Generation.

58.    Despite its lobbying efforts, however, multiple attempts to obtain a "legislative solution" to FirstEnergy's fiscal problems failed to pass, including several proposals in 2017 contained in House Bill 178, Senate Bill 128, and House Bill 381.

59.    As FirstEnergy continued to search for a solution to its nuclear plant problems, disgraced former Speaker of the Ohio House Larry Householder, who had left the position in 2004 amidst a bribery and kickback scandal involving campaign vendors for the Republican caucus, returned to Ohio politics, winning the November 2016 election for the House seat in Ohio's 72nd District.

60.    Householder's ultimate goal was to return to the Speaker position in the 2018 election. Thus, upon his election to the state legislature, Householder and his co-conspirators

proceeded with their plan to raise money and support "a team of electable candidates who would support Householder's bid for speakership."[2]

61.     Householder assumed the House seat on January 3, 2017. Days later, Householder flew on FirstEnergy's private jet to Washington, D.C. to attend the presidential inauguration, and the bribery scheme with FirstEnergy was set in motion. Following this trip, beginning in March 2017, Householder began receiving quarterly payments of $250,000 from FirstEnergy and FirstEnergy subsidiary FESC, into a bank account of an entity called Generation Now, a 501(c)(4) entity that Householder secretly controlled and that was incorporated just one month previously, in February 2017. Despite the omission of Householder's name from the account, there can be no dispute that Householder was the true owner: Clark, a lobbyist and Householder's co-conspirator, stated in a recorded conversation that "it's secret, a (c)(4) is secret. Nobody knows the money goes to the Speaker's account" and later explained that "Generation Now is the Speaker's (c)(4)."[3]

62.     As the Company continued funding Generation Now, the agreement was clear: FirstEnergy would support the candidacies of Householder and his allies in the upcoming 2018 election, in exchange for the legislative relief that was crucial to the Company's future. From 2017 to 2018, Generation Now would spend about $3 million in money funneled from FirstEnergy to support the election bids of Householder and nearly two dozen different candidates friendly to Householder who would then vote for his elevation to Speaker. Indeed, most of these candidates

---

[2]     ¶70. (References to "¶" are to the FBI Affidavit).

[3]     ¶¶46, 50.

won the 2018 general election; they all voted to name Householder as Speaker; and all but two eventually voted for FirstEnergy's bailout.

63.     FirstEnergy used FirstEnergy Service, as well as another entity it controlled, known in the FBI Affidavit as "Energy Pass-Through," to funnel the payments to Householder. Money that FirstEnergy paid to Generation Now was also used to pay for Householder's reelection staff (which otherwise would have been paid by Householder's candidate committee). Householder also used FirstEnergy's money, laundered through Generation Now, to purchase at least $97,000 worth of mail and radio advertisements in his district.

64.     Between the time when Generation Now's bank account was first opened in February 2017 and the 2018 general election, FirstEnergy funneled nearly $2.5 million into  Generation Now.[4] In addition, unbeknownst to the public but with Defendants' knowledge and/or reckless lack of knowledge, FESC funneled an additional $500,000 to a dark money group associated with the conspiracy in October 2018, bringing FirstEnergy's total bribery payments to $2.9 million.[5]

65.     At the same time that FirstEnergy was funneling millions of Company dollars to Householder and his allies through Generation Now, senior FirstEnergy Executives were in regular contact with Householder and his allies in furtherance of their illicit scheme. The FBI Affidavit sets forth numerous phone calls between Householder and his affiliates and FirstEnergy executives

---

[4]     ¶82.

[5]     ¶83.

19

on significant days in the 2018 election cycle that "corroborate the close coordination" among the members of the bribery scheme.[6]

66.　　These illicit payments were kept hidden from the public. By mid-2018, however, state campaign records showing FirstEnergy's contributions of about $149,000—a drop in the bucket compared to the concealed payments—to Householder and his legislative allies through the Company's political action committee drew media attention. An April 20, 2018 article on *Cleveland.com* noted FirstEnergy's close ties with Householder, including the 2017 flight to the presidential inauguration on FirstEnergy's private jet, and raised serious questions, stating, "[i]t's unclear exactly why FirstEnergy decided to put so much money behind Team Householder." The article reported that FirstEnergy enjoyed the support of Householder and his allies, as they co-sponsored a failed House Bill 381, which would have allowed "FirstEnergy subsidiaries to charge customers about $2.50 more per month to subsidize the Davis-Besse and Perry nuclear power plants in northern Ohio." When asked, a FirstEnergy spokesperson refused to "directly say why the company's PAC made the contributions."

67.　　On July 18, 2018, *Cleveland.com* published an article entitled "Dark money groups spent millions on Ohio legislative races," which discussed dark money funding of ads in Republican House primaries, including one "pro-Householder" political action committee funded by Generation Now and supportive of the House Bill 381 subsidy of the Company's two nuclear plants. The article reported that the group "raised $1 million from a single donor—a social welfare group registered in Delaware called Generation Now." Generation Now (with monies from

---

[6]　　¶¶84-85.

FirstEnergy) was to be used to promote House Bill 381, "which would subsidize two nuclear power plants in Ohio owned by FirstEnergy, the financially troubled utility company."

68. Despite the fact that the basic elements of the bribery conspiracy were stated in these news reports, Defendants took no action to address the misconduct that was already in progress for more than one year. Defendants failed to fulfill their oversight duties in investigating, identifying and redressing FirstEnergy's role in funding dark money groups, nor did they investigate or otherwise address the Company's connection with Householder and Generation Now.

### C. The Director Defendants Consciously Ignored Further Red Flags In Connection with the Passage of HB 6.

69. Between August and October 2018, FirstEnergy wired a total of $1.5 million to Generation Now, as well as an additional $500,000 to a dark money group set up by Householder's co-conspirator. Householder's allies won in the 2018 election, and those candidates proceeded to vote to make Householder Speaker, a position he assumed in 2019.

70. The day he was elected Speaker, Householder pledged to create a standing subcommittee on energy generation, which was created for the sole purpose of proposing and passing HB 6, which was introduced on April 12, 2019. HB 6 was designed to prevent the shutdown of FirstEnergy's nuclear plants by creating a $9 subsidy per megawatt hour of energy produced by nuclear or solar generators. The subsidy would be funded by instituting a monthly fixed charge on all residential, commercial, and industrial consumers. FirstEnergy would collect approximately 94% of the subsidy, which would total more than $160 million annually, as FirstEnergy's nuclear plants produced over 18.3 million megawatts in 2018 alone compared to just

1,095 megawatts produced by Ohio's six combined solar facilities. Newspapers immediately characterized HB 6 as a "bailout" for FirstEnergy.

71.     Uncertain as to whether HB 6 would pass, Generation Now engaged in a media blitz to influence public opinion and pressure legislators to vote in favor of the bill. FirstEnergy funded this entire media campaign, wiring $9.5 million to Generation Now in April and May 2019.

72.     As a result of the media campaign funded by FirstEnergy and Householder's influence within the House, HB 6 passed in the House on May 29, 2019.

73.     Less than a week after HB 6 was introduced in the Ohio Senate, FirstEnergy wired $2 million to Generation Now, the first of what would eventually amount to more than $7 million in secret funds to pay for polls, TV and radio commercials, and mailers.

74.     The FirstEnergy-funded strategy worked, and the Senate passed HB 6 approximately a month and a half after it was introduced, with some amendments that gave FirstEnergy the ability to decouple its energy rates from FirstEnergy's annual revenue.

75.     The bribery scheme then turned to protecting the legislation when public outrage over the law sparked a ballot initiative to overturn the law.

76.     Following the passage of HB 6, an article published on July 28, 2019 in the *Columbus Dispatch* stated that the campaign to pass HB 6 "included $9.5 million in TV ads, largely from a dark-money group backing FirstEnergy, which supported salvaging its bankrupt spinoff FirstEnergy Solutions." The article quoted the Executive Director of the Energy and Policy Institute, a clean energy watchdog group, as describing the amount of money spent by FirstEnergy to pass HB 6 as "astronomical," and yet Defendants still ignored blatant indications that the Company was misusing corporate funds to bribe public officials.

77.     The Company and Householder continued their illicit scheme of coordination in an effort to defeat a campaign to overturn HB 6 through a ballot initiative. From the passage of HB 6 through October 2019, FirstEnergy wired $23 million to Generation Now. Wire records indicate that "every penny of that $23 million came from Generation Now via [FirstEnergy] entities – specifically [FirstEnergy Service] and Energy Pass-Through."

78.     FirstEnergy and Generation Now also hired signature collection firms so that the firms would be prevented from working on the ballot initiative because of a conflict of interest.

79.     FirstEnergy's bribery scheme was a success: HB 6 went into effect on October 21, 2019, and the Company thereby secured a $1.3 billion bailout of its ailing nuclear power plants.

80.     In total, FirstEnergy paid out over $60 million in illegal bribes to secure the passage of HB 6.

### D.     The U.S. Attorney Places FirstEnergy Squarely in the Largest Public Bribery Scheme in Ohio History.

81.     On July 21, 2020, the U.S. Attorney's Office for the Southern District of Ohio announced the filing of criminal charges against Householder, Generation Now, Cespedes, Borges, and Householder associates Longstreth and Clark for a federal racketeering conspiracy to ensure the passage of HB 6. The U.S. Attorney called it the "largest bribery, money-laundering scheme ever perpetrated" in Ohio.

82.     The FBI Complaint makes clear that FirstEnergy's donations were made outside of campaign finance regulations and thus, "akin to bags of cash—unlike campaign or PAC contributions, they were not regulated, not reported, not subject to public scrutiny."

83.     FirstEnergy executives were personally involved in these efforts. In the crucial months when FirstEnergy and Householder were pushing for HB 6's passage, Jones had at

least 30 calls with Householder, and there was a total of 84 calls between them from just before when FirstEnergy started making payments to Generation Now in March 2017 through HB 6's passage in July 2019.

*84.*     Similarly, other Company officials had numerous phone contacts with the criminal defendants at the time FirstEnergy was making large donations to Generation Now, including FirstEnergy's Director of Ohio Affairs (188 calls) and FESC's VP of External Affairs (14 calls). These calls, as well as text messages and other communications, taken together with bank records of FirstEnergy's donations to Generation Now, "paint a clear picture of the partnership between the Enterprise and [FirstEnergy] in working towards their agreement."

85.     In addition, the FBI Complaint included a description of a meeting among "members of the Enterprise and [FirstEnergy] executives, including 'the CEO of the Company'" that took place during FirstEnergy and Householder's effort to defeat the ballot initiative opposing HB 6's enactment. "Company brass" reviewed advertisements supporting HB 6 at that meeting.

86.     Moreover, Defendant Strah, who "is now the President of [FirstEnergy]," was FESC's Senior Vice President and CFO until May 2020 and signed the checks that FESC paid to Generation Now.

87.     In announcing the charges, U.S. Attorney David M. DeVillers and Chris Hoffman, FBI, Special Agent in Charge, described the gravity of the charges. Mr. Hoffman stressed to reporters that this was a "sophisticated criminal conspiracy to enact legislation on behalf of Corporation A to corruptly defeat the potential ballot initiative that could've gone in front of the Ohio taxpayers."

88.     U.S. Attorney DeVillers also seemed to confirm FirstEnergy's identity as Company A stating: "Company A, provided $60 Million in return for the $1.3 billion bailout. Everyone in this room knows who Company A is, I will not be mentioning the name of Company A because of our regulations and rules."

89.     On the same day, FirstEnergy released a statement stating that the Company had received subpoenas in connection with the investigation.

90.     The price of FirstEnergy stock plummeted on the news of the Company's fraud, falling to a low of just $22.85 per share on July 22, 2020, 45% below the stock's closing price on July 20, 2020 of $41.26 per share, on abnormally high trading volume.

**E.     The Fallout from the Bribery Scheme Continues**

91.     The fallout from the bribery scheme has been dramatic, severe, and destructive for FirstEnergy and will only continue to worsen as more information regarding the details of the scheme are revealed.

92.     On July 24, 2020, the Company conducted an earnings call for the second quarter of 2020. On the call, Jones admitted that "of the funds that are referenced in the Department of Justice affidavit, FirstEnergy's share of that is about 25%."

93.     On July 30, 2020, a grand jury in the Southern District of Ohio indicted Householder and the other arrested conspirators. *See United States v. Householder, et al.,* 1:20-cr-00077 (S.D. Ohio). The Ohio House of Representatives subsequently voted unanimously to strip Householder of his Speaker position—the first time in Ohio's history that the House has voted to unseat its leader.

94. Also on that day, Representative Bob Cupp was elected to replace the indicted Larry Householder as the next Speaker of the Ohio House of Representatives. Ironically, Cupp too may have unethical FirstEnergy ties. According to an August 10, 2020 article, FirstEnergy "has been Cupp's sixth highest donor, with its PAC contributing a total of $21,650 over seven elections," and Cupp was "the subject of a judicial ethics complaint involving campaign contributions from FirstEnergy."

95. On July 30, 2020, it was reported that two state representatives were seeking to repeal a different piece of legislation that unfairly benefited FirstEnergy: a 2019 budget bill provision that allowed the Company to combine the profits of three subsidiaries to avoid a finding that one had "significantly excessive" profits, which would need to be returned to customers pursuant to Ohio law. In a statement calling for the repeal of the "Corrupt Price Gouging Budget Amendment Benefiting FirstEnergy," one of the bill's sponsors said that the "pay-to-play mentality has to come to an end."

96. On August 10, 2020, FirstEnergy filed a Notification of Late Filing with the SEC stating that they would not be able to file their quarterly report on time due to the "investigation, subpoenas and subsequent pending and threatened litigation."

97. In addition to the criminal charges, FirstEnergy has been named in numerous civil lawsuits in connection with the Ohio bribery scheme, including class actions under the federal securities laws, suits brought under federal racketeering laws, and lawsuits alleging gross negligence, breach of contract, and deceptive consumer acts or practices.

98. On August 12, 2020, the Cleveland City Council voted unanimously to launch investigations into whether the FirstEnergy corruption scandal sought to harm city-owned Cleveland Public Power.

99. On September 8, 2020, the Office of the Ohio Consumers' Counsel ("OCC")—a statewide legal representative for Ohio's residential consumers in matters related to utilities—filed a motion before the Public Utilities Commission of Ohio ("PUCO") asking the Commission to open an independent management audit and investigation into FirstEnergy. Specifically, the OCC requested that PUCO investigate FirstEnergy's corporate governance, its corporate relationships (including its utility relationships with other FirstEnergy affiliated entities), and whether any money collected from consumers was improperly used to pay bribes in connection with HB 6 instead of for legitimate electric utility service. OCC also requested that PUCO hire an independent auditor to investigate FirstEnergy's bribery scheme and to publicly file a report of findings and recommendations for consumer protection.

100. On September 15, 2020, the media reported that the SEC had launched an investigation into FirstEnergy and its connection to the HB 6 bribery scandal. The SEC's investigation—which had been concealed by the Company for months—came to light in a lawsuit FirstEnergy filed on September 1, 2020 against a former employee of a consulting company contracted by FirstEnergy who had access to internal FirstEnergy documents. The court filings in that lawsuit indicated that the former employee provided internal FirstEnergy documents to the SEC as part of the SEC's whistleblower program. In particular, the whistleblower ostensibly provided the SEC with 57 confidential FirstEnergy files relating to the bribery investigation, including reviews and approvals of wire transfers and tax payments.

101. On September 23, 2020, the Ohio Attorney General filed a civil racketeering lawsuit against FirstEnergy, Householder, and other co-conspirators. The lawsuit seeks to block FirstEnergy's two nuclear power plants from receiving the more than $1 billion ratepayer bailout enacted as part of HB 6. When this action was filed, Ohio Attorney General Dave Yost stated that

"[g]iven the corruption surrounding House Bill 6, it is proper to block these ill-gotten gains from filling the coffers of those under criminal indictment." At the end of October 2020, FirstEnergy terminated the employment of defendant Jones upon the guilty pleas of two of the indicted co-conspirators, Cespedes and Longstreth. In early November 2020, FirstEnergy separated from both Robert Reffner, the chief legal officer and defendant Yeboah-Amankwah.

102. The full costs to FirstEnergy from its illicit conduct are not yet known, but initial reports from analysts predict massive regulatory fines. Wolfe Research and CreditSights have estimated fines and penalties to the Company in the $500 million range. Mizuho Securities USA LLC estimates a $1.0 billion fine in connection with the Householder investigation. UBS stated that they "consider an SEC investigation a possibility (similar to what [Exelon Corporation] faces) and we believe there is the potential for credit rating agencies to downgrade FE to non-investment grade (BBB-/Baa3)."

## IV. THE DEFENDANTS VIOLATED SECTION 14(A) OF THE EXCHANGE ACT

### A. Defendants File False Proxy Statements in Violation of Section 14(a) of the Exchange Act.

103. The Director Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing FirstEnergy to file proxy statements that failed to disclose the material information concerning the Ohio bribery scheme and the materially deficient internal controls and compliance practices that allowed for the bribery scheme. The Director Defendants' failure to disclose those material facts constitutes a breach of their fiduciary duties.

### 1. The Director Defendants Caused FirstEnergy to File Materially False and Misleading Statements in the 2018 Proxy.

104. On March 30, 2018, the Director Defendants caused FirstEnergy to file its 2018 Annual Proxy Statement (the "2018 Proxy") in connection with the 2018 annual stockholders meeting to be held on May 15, 2018. In the 2018 Proxy, the Defendants solicited stockholders to vote for, among other things: (i) re-electing themselves to the Board, and (ii) approve executive compensation. With respect to each of these solicitations the Director Defendants issued materially false or misleading statements.

105. The 2018 Proxy was signed by Defendant Yeboah-Amankwah. An opening letter accompanying the 2018 Proxy was signed by FirstEnergy President and Chief Executive Officer Jones, Board Chairman Elect Donald T. Misheff, and Board Chairman George M. Smart.

106. The 2018 Proxy described the Board's key role in risk oversight. Specifically, the 2018 Proxy stated, "Your Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant risks." It detailed committees such as a "Risk Policy Committee, consisting of the Chief Risk Officer and senior executive officers, provid[ing] oversight and monitoring to ensure that appropriate risk policies are established and carried out and processes are executed in accordance with selected limits and approval levels" through the provision of "timely reports on significant risk issues" to, among others, respective Board committees and the full Board.

107. The 2018 Proxy Statement also detailed how FirstEnergy's Audit Committee was in place to assist the Board with: "the integrity of your Company's financial statements; your Company's compliance with legal, risk management and oversight, and regulatory requirements; . . . and your Company's systems of internal control with respect to the accuracy of financial records, adherence to Company policies, and compliance with legal and regulatory requirements."

108. Specifically, with respect to the Corporate Governance Committee, the 2018 Proxy stated that the Committee's "charter requires it to also periodically review the Company's Corporate Political Activity Policy, including practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations." According to the 2018 Proxy, "The Corporate Governance Committee is guided by its charter, the Corporate Governance Policies, and other applicable laws and regulations[.]"

109. The 2018 Proxy also falsely and misleadingly stated that the Board effectively managed risk and promoted compliance with laws, and omitted any material disclosures regarding FirstEnergy's: (i) ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately address the Ohio bribery scheme; and (iii) Board-approved compensation programs that encouraged the risky conduct that led to the Ohio bribery scheme. The 2018 Proxy also omitted any disclosures reflecting that the Director Defendants failed to address numerous red flags after they should have been aware of the misconduct. Indeed, by the time the 2018 Proxy was filed the Ohio bribery scheme was already well underway and FirstEnergy had already funneled millions of dollars to Householder in return for a financial bailout. Moreover, by this time there was already heightened scrutiny over Householder's problematic past, and multiple news reports had publicly pointed to Householder's relationship with FirstEnergy.

110. The 2018 Proxy harmed FirstEnergy by resulting in the reelection of directors following an uninformed stockholder vote. These directors subjected FirstEnergy to significant monetary and reputational damages. As a result of the materially misleading statements in the 2018 Proxy Statement, FirstEnergy stockholders voted to re-elect Defendants Addison, Anderson,

Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Thornton to the Board.

111.     With respect to the Company's compensation plan, the 2018 Proxy falsely stated that FirstEnergy aligned "executives' interests with the long-term interests of our shareholders without encouraging excessive risk taking" by mitigating features such as "The mix of compensation among base salary, and short- and long-term incentive programs is not overly weighted toward short-term incentives, and thus, does not encourage excessive risk taking[.]"

112.     The statements in the 2018 Proxy related to compensation were materially false and misleading in that they conveyed to stockholders that FirstEnergy's compensation structures encouraged long-term stockholder value, pay for performance, and good governance. In reality, FirstEnergy's compensation system encouraged the risky conduct that led to the Ohio bribery scheme.

113.     On the basis of the materially false and misleading 2018 Proxy, FirstEnergy shareholders voted in support of generous compensation to Defendants Jones, Pearson, and Strah, causing damage to FirstEnergy.

**2.     The Director Defendants Caused FirstEnergy to File Materially False and Misleading Statements in the 2019 Proxy.**

114.     On April 1, 2019, the Director Defendants caused FirstEnergy to file its 2019 Annual Proxy Statement (the "2019 Proxy") in connection with the 2019 annual stockholders meeting to be held on May 21, 2019. In the 2019 Proxy, the Director Defendants solicited stockholders to vote for, among other things: (i) re-election of themselves to the Board; and (ii) approval of executive compensation. With respect to each of these solicitations for votes, the Director Defendants issued materially false or misleading statements.

31

115. The 2019 Proxy was signed by Defendant Yeboah-Amankwah, An opening letter accompanying the 2019 Proxy was signed by FirstEnergy President and Chief Executive Officer Charles E. Jones and Board Chairman Donald T. Misheff.

116. The 2019 Proxy was materially false and misleading in describing the Board's role in risk oversight. Specifically, the 2019 Proxy stated, "Your Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant risks." It detailed committees such as a "Risk Policy Committee, consisting of the Chief Risk Officer and senior executive officers, provid[ing] oversight and monitoring to ensure that appropriate risk policies are established and carried out and processes are executed in accordance with selected limits and approval levels" through the provision of "timely reports on significant risk issues" to, among others, respective Board committees and the full Board.

117. The 2019 Proxy Statement also detailed how FirstEnergy's Audit Committee was in place to assist the Board with: "the integrity of your Company's financial statements; your Company's compliance with legal, risk management and oversight, and regulatory requirements . . . and your Company's systems of internal control with respect to the accuracy of financial records, adherence to Company policies, and compliance with legal and regulatory requirements."

118. Specifically, with respect to the Corporate Governance Committee, the 2019 Proxy contained the materially false and misleading statements that the Committee's "charter requires it to also periodically review the Company's Corporate Political Activity Policy, including practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations." According to the 2019 Proxy, "The Corporate Governance Committee is guided by its charter, the Corporate Governance Policies, and other applicable laws and regulations[.]"

119.    The 2019 Proxy also contained materially false and misleading statements that the Board effectively managed risk and promoted compliance with laws, and omitted any material disclosures regarding First Energy's: (i) ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately address the Ohio bribery scheme; and (iii) Board-approved compensation programs that encouraged the risky conduct that led to the Ohio bribery scheme. The 2019 Proxy also omitted any material disclosures reflecting or acknowledging that Director Defendants failed to address numerous red flags after they should have been aware of the misconduct. Indeed, by the time the 2019 Proxy was filed the Ohio bribery scheme had already commenced and FirstEnergy had funneled millions of dollars to Householder in return for a financial bailout. Moreover, by this time there was already heightened scrutiny over Householder's problematic past and multiple news reports had pointed to Householder's relationship with FirstEnergy.

120.    The 2019 Proxy was harmful to FirstEnergy and resulted in the reelection of directors who subjected FirstEnergy to significant monetary and reputational damages on the basis of an uninformed stockholder vote. As a result of the misleading statements in the 2019 Proxy, FirstEnergy stockholders voted to re-elect Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner to the Board.

121.    With respect to the Company's compensation plan, the 2019 Proxy contained the materially false and misleading statements that  FirstEnergy aligned "executives' interests with the long-term interests of our shareholders without  encouraging excessive risk taking" by mitigating features such as "The mix of compensation  among base salary, and short- and long-term incentive programs is not overly weighted toward  short-term incentives, and thus, does not encourage excessive risk taking[.]"

33

122.    The statements in the 2019 Proxy related to compensation also contained statements regarding FirstEnergy's compensation structures, but failed to disclose the material information that FirstEnergy's compensation system actually encouraged the risky conduct that led to the Ohio bribery scheme.

123.    Based on the materially false and misleading statements contained in the 2019 Proxy, FirstEnergy shareholders voted in support of compensation to Defendants Jones, Strah, and Pearson and other executives totaling over $11.1 million, $3.4 million, and $3.8 million, respectively, in 2018 and causing damage to FirstEnergy, without the benefit of material information regarding Defendants' role in, and their failure to address, the Ohio bribery scheme.

**3.    The Director Defendants Caused FirstEnergy to File Materially False and Misleading Statements in the 2020 Proxy.**

124.    On April 1, 2020, the Director Defendants caused FirstEnergy to file its 2020 Proxy Statement (the "2020 Proxy") in connection with the 2020 annual stockholders meeting to be held on May 19, 2020. In the 2020 Proxy, the Director Defendants solicited stockholders to vote for, among other things: (i) re-electing themselves to the Board; and (ii) approving executive compensation. With respect to each of these solicited votes, these Director Defendants issued materially false or misleading statements.

125.    The 2020 Proxy was signed by Defendant Yeboah-Amankwah. An opening letter accompanying the 2020 Proxy was signed by FirstEnergy President and Chief Executive Officer Charles E. Jones and Board Chairman Donald T. Misheff.

126.    The 2020 Proxy contained materially false and misleading statements describing the Board's key role in risk oversight. Specifically, the 2020 Proxy stated, "Your Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant

34

risks." It detailed committees such as a "Risk Policy Committee, consisting of the Chief Risk Officer and senior executive officers, provid[ing] oversight and monitoring to ensure that appropriate risk policies are established and carried out and processes are executed in accordance with selected limits and approval levels" through the provision of "timely reports on significant risk issues" to, among others, respective Board committees and the full Board.

127. The 2020 Proxy Statement also detailed that FirstEnergy's Audit Committee was in place to assist the Board with: "the integrity of your Company's financial statements; your Company's compliance with legal, risk management and oversight, and regulatory requirements; . . . and your Company's systems of internal control with respect to the accuracy of financial records, adherence to Company policies, and compliance with legal and regulatory requirements."

128. Specifically, with respect to the Corporate Governance Committee, the 2020 Proxy stated that the Committee's "charter requires it to also periodically review the Company's Corporate Political Activity Policy, including practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations." According to the 2020 Proxy, "The Corporate Governance Committee is guided by its charter, the Corporate Governance Policies, and other applicable laws and regulations[.]"

129. The 2020 Proxy contained materially false and misleading statements that the Board effectively managed risk and promoted compliance with laws, and omitted any disclosures regarding: (i) FirstEnergy's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately address the Ohio bribery scheme; and (iii) Board-approved compensation programs that encouraged the risky conduct that led to the Ohio bribery scheme. The 2020 Proxy also omitted any disclosures reflecting that the Director Defendants failed to address numerous red

flags after they should have been aware of the misconduct. Indeed, by the time the 2020 Proxy was filed the Ohio bribery scheme was underway, and FirstEnergy had funneled millions of dollars to Householder in return for a financial bailout. Moreover, by this time there was already heightened scrutiny over Householder's problematic past, and multiple news reports had pointed to Householder's relationship with FirstEnergy.

130.    The 2020 Proxy was harmful to FirstEnergy in that it resulted in the reelection of directors who subjected FirstEnergy to significant monetary and reputational damages on the basis of an uninformed stockholder vote. As a result of the misleading statements in the 2020 Proxy, FirstEnergy stockholders voted to re-elect Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner to the Board.

131.    With respect to the Company's compensation plan, the 2020 Proxy contained materially false and misleading statements that FirstEnergy aligned "executives' interests with the long-term interests of our shareholders without encouraging excessive risk taking" by mitigating features such as "The mix of compensation among base salary, and short- and long-term incentive programs is not overly weighted toward short-term incentives, and thus, does not encourage excessive risk taking[.]"

132.    The statements in the 2020 Proxy related to compensation contained materially false and misleading information in that it conveyed that FirstEnergy's compensation structures encouraged long-term stockholder value, pay for performance, and good governance. In reality, FirstEnergy's compensation system actually encouraged the risky conduct that led to the Ohio bribery scheme.

133.    Under this false impression, numerous FirstEnergy stockholders voted in support of compensation to Defendant Jones, Strah, and Pearson and other executives, totaling over $14.6

36

million, $6.0 million, and $7.2 million, respectively, in 2019 and causing damage to FirstEnergy, without the benefit of material information regarding Defendants' role in, and their failure to address, the Ohio bribery scheme.

## V.   THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

### A.   General Duties of Officers and Directors.

134.   By reason of their positions as directors and officers of FirstEnergy and because of their ability to control the business, corporate, and financial affairs of the Company, Defendants owed FirstEnergy and its stockholders fiduciary obligations of trust, loyalty, good faith, candor, and due care, and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. These duties included ensuring that FirstEnergy remained in compliance with all applicable federal and state laws, rules and regulations. Defendants must act in furtherance of the Company's best interests so as to benefit all shareholders equally and not in furtherance of any Defendants' personal interest(s) or benefit.

135.   Accordingly, Defendants were required to:

a. Ensure that the FirstEnergy was operated in a diligent, honest, and prudent manner in accordance with federal and state laws, rules and regulations, and the Company's corporate charter and bylaws;

b. Remain informed as to how FirstEnergy conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith and to take corrective and preventative steps, for the purposes of, *inter alia*, maximizing shareholder value and preserving the Company's reputation and goodwill;

c. Maintain and implement adequate financial and operational controls, such that the Company's operations would comply with all laws;

d. Ensure the accuracy of public filings through sufficient supervision of the preparation, filing, or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by FirstEnergy, and to track, monitor, and assess any reports of examinations or investigations concerning the practices,

37

products or conduct of officers of the Company; and

e. Act with prudence and restraint, so as not to unduly benefit themselves and other FirstEnergy insiders at the expense of the Company.

136. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on a securities exchange, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings, and present and future business prospects; and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based on truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.

**B. Defendants' Obligations Under FirstEnergy's Corporate Codes and Policies**

137. FirstEnergy's Code of Business Conduct (the "Code") applies to each of the Defendants. The Code states:

> FirstEnergy personnel are all responsible for complying with applicable laws and regulations and the principles and provisions included in this Code. … Known or suspected violations of laws, rules, regulations or this Code are serious matters and must be dealt with accordingly…. This reporting requirement includes any actual, potential or suspected violations of the securities laws (such as any accounting, investor or financial and financial reporting related matters). …
>
> *Protection of Corporate Assets, Including Corporate Funds* - We have a responsibility to use Company assets efficiently and carefully and to protect them from loss, theft, misuse, waste and carelessness, which have a direct impact on the Company's profitability. Company assets and funds may be used only for legitimate business purposes and may never be used for illegal purposes. Do not keep undisclosed funds nor establish any undisclosed accounts while conducting your work. Do not knowingly cause corporate funds to be used for unlawful purposes or for purposes other than those described by the documentation supporting payment. …

*Compliance with the Law* - Comply with both the letter and spirit of all applicable U.S. and foreign laws, rules and regulations, seeking any necessary clarifications from your immediate supervisor or the Legal Department. Do not knowingly take, or permit to be taken, any action on behalf of the Company that violates any law, rule or regulation. Acknowledge that you are expected to have an understanding of the applicable laws, rules and regulations that affect our work assignments. …

138.    As Defendant Jones himself stated:

Maintaining high ethical standards builds trust with our customers, shareholders, fellow personnel, and the communities we serve. At FirstEnergy, we are all responsible for upholding high standards and being aware of ethical issues that we may face on the job. Our Code of Business Conduct communicates the fundamentals of ethical behavior in the workplace and provides important guidelines to ensure we maintain our high standards. It applies equally to all FirstEnergy personnel, including the Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer.

139.    The Company's Corporate Governance Policies state in unequivocal terms:

The Board believes that the long-term success of the Company is dependent upon the maintenance of an ethical business environment that focuses on adherence to both the letter and the spirit of regulatory and legal mandates.

Board and committee agendas and materials are established with legal and regulatory requirements in mind. The Board expects that … management will acknowledge adherence to and conduct operations consistent with the Code of Business Conduct…

140.    Under the Company's Political Activity Policy, the Defendants also had duties

to identify and report illegal or unethical business practices within the Company:

Under federal law, there are limits on a corporation's ability to give direct corporate contributions to federal candidates and national political parties. Accordingly, FirstEnergy does not contribute corporate funds directly to federal political candidates or parties.

Each state has different laws, rules and regulations governing political contributions in state and local elections. Any corporate political contributions by FirstEnergy are made in accordance with applicable laws, rules and regulations.

141. Further, a number of board committees exist that monitor specific aspects of FirstEnergy's business. These include the Audit Committee; the Compensation Committee; the Corporate Governance and Corporate Responsibility Committee; the Finance Committee; and the Operations, Safety and Nuclear Oversight Committee.

142. Defendants Johnson, Misheff, Mitchell, and Reyes sit on the Corporate Governance and Corporate Responsibility Committee. Under the Charter of the Corporate Governance and Corporate Responsibility Committee, its Committee is obliged to periodically review the Company's Corporate Political Activity Policy, including practices relating to corporate participation, and dues and/or contributions to industry groups and trade associations.

143. Defendants O'Neil, Pappas, Pianalto, and Turner currently comprise the Compensation Committee. Under the Charter of the Compensation Committee, the Compensation Committee's purpose is to, among other things, "review, discuss, and endorse a compensation philosophy and objectives that support competitive pay for performance and are consistent with the corporate strategy," and "assist the Board in establishing the appropriate annual salary, incentive compensation and equity-based plans for the Company's Section 16 Officers, remaining Executive Council members, and certain other senior-level officers . . . and to align such plans with Company and business unit performance, business strategies and growth in shareholder value."

144. Defendants Anderson, Misheff, Pianalto, and Turner presently comprise the Audit Committee. Under the Audit Committee Charter, its purpose is to, among other matters, "assist the Board with oversight of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal, risk management and regulatory requirements. . . . and (v) the Company's systems of internal controls with respect to the accuracy of financial records,

adherence to Company policies and compliance with legal and regulatory requirements." The Committee is obliged to "review and discuss the annual audited financial statements and quarterly financial statements with management and the independent auditor," "oversee, require and review periodic evaluations of the Company's internal control and corporate compliance structures," and to "oversee, assess, discuss, and review the Company's policies with respect to the Company's . . .  assessment and management of risks . . . ." The Audit Committee's Charter also states:

> Periodically, the Committee shall meet with appropriate members of management to review adherence to applicable federal, state, and local laws and corporate policies and review processes relating to training, monitoring and reporting of policy compliance. In particular, the Committee shall review the Company's Code of Business Conduct to determine that it is designed to provide adequate protection against violations of applicable laws and regulations, and shall review the record keeping and reporting systems to measure and monitor regulatory compliance requirements.

145.    Defendants failed to meet their responsibilities and obligations as set forth above. Defendants' illegal course of conduct constituted breaches of their fiduciary duties to FirstEnergy, as well as violations of state and federal law, and resulted in significant harm to the Company.

## VI.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

146.    Plaintiff is a current owner of FirstEnergy common stock and was a continuous owner of FirstEnergy common stock during the Relevant Period.

147.    The Company is named in this action solely as a nominal party. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

148.    Plaintiff brings this action derivatively to redress injuries suffered, and to be suffered, by the Company as a direct result of the breaches of fiduciary duty, unjust

enrichment, gross mismanagement, contribution and indemnification, and violations of Section 14(a) of the Exchange Act.

149.    Plaintiff will adequately and fairly represent the interests of FirstEnergy in enforcing and prosecuting its rights, and has retained counsel who are competent and experienced in stockholder derivative litigation. Prosecution of this action is in the best interests of the Company.

150.    As a direct and proximate result of Defendants' misconduct, FirstEnergy has endured serious harms. These harms range from reputational harms and injury to FirstEnergy's goodwill and credibility, which may result in impairment of the Company's future ability to raise debt or equity capital on favorable terms. Moreover, as a direct and proximate result of Defendants' misconduct, FirstEnergy has been named a defendant in various civil lawsuits brought by the Ohio AG, ratepayers, and shareholders, and is also now the subject of federal investigation. FirstEnergy will incur costs in defending against, and the potential settlement of, these civil and criminal legal and regulatory proceedings brought against the Company related to the Ohio bribery scheme.

151.    The full costs to FirstEnergy arising from the illicit bribery scheme are not yet known, but initial reports from analysts suggest that regulatory fines will be massive—ranging anywhere from the $500 million range to $1 billion dollars.

152.    The FirstEnergy Board, at the time of filing of this action, consisted of ten directors, each of the eleven Director Defendants with the exception of Jones who was terminated in late October 2020. Demand is futile because at least a majority of those ten directors are conflicted, and cannot disinterestedly or independently consider a demand.

153.    As alleged above, the Defendants breached their fiduciary duties by (i) failing to  properly monitor the Company's core operations and the conduct of its executives, which led

to FirstEnergy's involvement in the Ohio bribery scheme; (ii) failing to disclose to shareholders material adverse information regarding FirstEnergy's business and in fact acting to limit the amount of information to be disclosed to shareholders; and (iii) consciously disregarding numerous red flags related to the Ohio bribery scheme.

154.    Plaintiff has not made any demand upon the FirstEnergy Board to institute this action against the Individual Defendants because, for the reasons described below, any such demand would have been futile and useless, and is therefore excused.

**A.    Demand is Excused Because the Director Defendants Face a Substantial Likelihood of Liability.**

155.    Demand is excused because the Director Defendants face a substantial likelihood of liability for the claims asserted against them in this Complaint, given their awareness of or conscious disregard of significant red flags relating to the Ohio bribery scheme; and their failure to ensure that FirstEnergy's internal controls and compliance functions were functioning.

**1.    Demand is Futile Because the Director Defendants Face a Substantial Likelihood of Liability for Securities Laws Violations.**

156.    The Director Defendants each face a substantial likelihood of liability for their actions described herein, rendering any demand upon them futile. Each participated in and/or caused the issuance of the 2018, 2019, and 2020 Proxies described above. These Proxies inaccurately assured the investing public that the Board maintained effective risk management controls. These Proxies lacked disclosures of (i) the ineffective internal and disclosure controls at the board level; (ii) the reporting failures that failed to address serious and illegal misconduct by senior executives; and (iii) the fact that the Company actually encouraged, and consistently rewarded, extreme risk-taking and illegal practices. The Director Defendants had

knowledge of undisclosed material facts alleged herein and knowingly or consciously disregarded them and acted in bad faith by releasing the false and misleading Proxies.

157. Moreover, several of the Directors acted to ensure that the Company's disclosures omitted material information regarding the Company's lobbying efforts, which would have revealed the illegal conduct.

158. The Company filed its 2017 proxy statement with the SEC on March 31, 2017 (the "2017 Proxy"), which included a shareholder proposal requiring an annual report disclosing lobbying policies and payments (the "2017 Lobbying Proposal"). Propounded by The Nathan Cummings Foundation, the 2017 Lobbying Proposal noted that "full disclosure of our company's direct and indirect lobbying activities and expenditures is required to assess whether FirstEnergy's lobbying is consistent with its expressed goals and in the best interests of shareholders." The Nathan Cummings Foundation further noted that the Company did not choose to disclose its lobbying payouts, whereas the Company disclosed its federal lobbying payouts exceeded $4 million in 2014 and 2015. The silence on state lobbying posed a "reputational risk." In a prescient note, the Nathan Cummings Foundation observed that "absent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests." As a result, the 2017 Lobbying Proposal asked that the Company prepare annual reports disclosing:

   a. Company policy and procedures governing lobbying, both direct and indirect, and grassroots lobbying communications.

   b. Payments by FirstEnergy used for (a) direct or indirect lobbying or (b) grassroots lobbying communications, in each case including the amount of the payment and the recipient.

   c. FirstEnergy's membership in and payments to any tax-exempt organization that writes and endorses model legislation.

      d.  A description of the decision-making process and oversight by management and the Board for making payments described herein.

159.    The report was to be presented to the Audit Committee or other relevant oversight committee and posted on FirstEnergy's website.

160.    Defendants Jones, Anderson, Demetriou, Johnson, Misheff, Mitchell, Pappas, and Reyes reacted by recommending that shareholders vote against the 2017 Lobbying Proposal, and instead rely on the existing disclosure framework, under which many state lobbying efforts could remain undisclosed. Indeed, that lack of disclosure meant that the market was not told the amounts that FirstEnergy would supply (and was already supplying) to Householder.

161.    The Company's Board has evinced, through its 2015, 2016, and 2017 recommendations to vote against shareholder proposals to increase lobbying transparency, serious opposition to disclosing the Company's payments to state public officials. Moreover, in 2017, just months after the Ohio bribery scheme began, a majority of the current Board recommended that shareholders vote against a proposal that would have required disclosure of the illegal payments at issue. The Board, in the face of knowledge and notice that payments to state officials by the Company required monitoring and disclosure, rejected an effort at greater transparency. Thus, demand on the current Board to take action in response to the illegal payments would be futile.

      **2.**    **The Director Defendants Face a Substantial Likelihood of Liability for Failing to Exercise Their Fiduciary Duties to FirstEnergy.**

162.    The Director Defendants failed to institute and maintain an internal, board-level monitoring system that would prevent or monitor illegal conduct. The Director Defendants also failed to respond to red flags that indicated illegal conduct. Knowledge of the red flags is further imputed to the Board through various committees tasked with specific and enhanced monitoring and oversight duties, including the oversight of the lobbying efforts that diverted $60 million from

Company coffers to the Enterprise. Duties of the various committees included, among other things, legal and regulatory oversight, ensuring the safety and soundness of the Company's business practices, responsiveness to whistleblower complaints, and ensuring that the Company's compensation structure did not encourage excessive risk taking. Each Board Committee was responsible for reporting to the Board concerning these issues.

163. During the Relevant Period, Director Defendants Anderson, Misheff, Pianalto, and Turner served as members of the Audit Committee and had responsibility for, inter alia, reviewing the Company's annual and quarterly financial reports, reviewing the integrity of the Company's internal controls, and ensuring that the Company was in compliance with legal and regulatory regimes.

164. The illegal conduct was a result of systemic control failures at the Company. Defendants Anderson, Misheff, Pianalto, and Turner failed to preserve the integrity of the Company's internal controls, ignored red flags, and also allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures, and caused or allowed the illicit activity described herein. As a direct and proximate result, the Company became embroiled in the Ohio bribery scheme and became the subject of investigations by the U.S. Attorney and FBI. Therefore, Defendants Anderson, Misheff, Pianalto, and Turner face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

165. During the Relevant Period, Defendants O'Neil, Pappas, Pianalto, and Turner served as members of the Compensation Committee. Pursuant to the Compensation Committee Charter, the members of the Compensation Committee were and are responsible for, developing and reviewing the Company's compensation system, as well as assessing risks related

to the compensation system. Defendants O'Neil, Pappas, Pianalto, and Turner breached their fiduciary duties of due care, loyalty, and good faith, because the Compensation Committee, *inter alia*, allowed or permitted the Company to engage in the illicit activity described herein, and encouraged risky conduct through the Company's compensation system, which ultimately led the Company to become embroiled in the Ohio bribery scheme and become the subject of investigations by the U.S. Attorney and the FBI. Therefore, Defendants O'Neil, Pappas, Pianalto, and Turner face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

166.    Demand is also excused because the Board's complicity in the bribery scheme constitutes unlawful activity or the facilitation of unlawful activity. The Board flouted their duties by affirmatively adopting, implementing, and/or condoning a business strategy based on violations of law and/or statutes (federal and/or state). Illegal or illicit conduct is not protected under the business judgment rule, and may not be later ratified. Given the size of the contributions, Director Defendants knew or should have known that $60 million moved out of the Company in exchange for a billion-dollar kickback.

167.    In order to properly prosecute this lawsuit, it would be necessary for the directors to sue themselves and the other defendants, requiring them to expose themselves and to millions of dollars in potential civil liability and criminal or SEC sanctions. The directors will not sue themselves.

168.    For the above reasons, the Board is incapable or unwilling to take the actions required to seek the relief requested in this Complaint. Because a majority of the Board faces a substantial risk of liability, demand is futile.

**B.      Demand is Excused Because Certain Directors Are Not Independent.**

47

169.    Many of the directors serve together on other boards, which compromises their judgment and ability to be independent from each other. For example, Directors Misheff and Pappas serve together on the Trinseo S.A. board of directors, Misheff since February 2015 and Pappas since October 2010. Pappas served as Trinseo's President and CEO from June 2010 through March 2019, and he is currently a Special Adviser to Trinseo's President and CEO. Directors Misheff and Demetriou served together on the Aleris Corporation board of directors, Misheff from December 2013 through April 2018, and Demetriou as Chairman and CEO from 2004 through 2015. Misheff also is a director on the TimkenSteel Corporation board.  FirstEnergy's Executive Vice President of Corporate Strategy, Regulatory Affairs and Chief Legal Officer from May 2016 through April 2019, Leila Vespoli, also serves on TimkenSteel's board.  TimkenSteel, an Ohio-headquartered steel manufacturer, publicly advocated for the passage of HB  6. Joe Price, a TimkenSteel senior executive, testified before the Ohio House Energy and Natural Resources Committee on May 15, 2019, in support of HB 6 for eliminating a mandate that required the purchase of renewable energy, which he said created costs to the Company that were "significant" and "rising." TimkenSteel also supported Householder, donating $5,000 to his Friends of Householder PAC in February 2020.

170.    For all of these reasons, the Board is incapable or unwilling to take the actions required to seek the relief requested in this Complaint. Because a majority of the Board faces a substantial risk of liability, demand is futile.

## VII.        CLAIMS

### COUNT I

**(Breach of Fiduciary Duty Against The Director Defendants)**

171.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

172.    Each of the Director Defendants owed and owe fiduciary duties to the Company and its stockholders—specifically, the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.

173.    As set forth in this Complaint, each of the Director Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry to the Company by failing to monitor and consciously ignoring numerous red flags related to the Ohio bribery scheme. Their conduct was characterized by intentional, reckless, or grossly negligent breaches of the fiduciary duties they owed to FirstEnergy to protect its rights and interests.

174.    Additionally, the Director Defendants have specific duties as set forth in the Company's corporate governance documents, including the charters of various Board committees, and had they been discharged in accordance with the Director Defendants' obligations, it would have necessarily prevented the misconduct and the consequent harm to the Company alleged in this Complaint.

175.    Further, as alleged in detail herein, each of the Director Defendants (and particularly the Defendants on the Audit Committee) had a duty to ensure that FirstEnergy disseminated accurate, truthful, and complete information to its shareholders. Defendants

violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to FirstEnergy shareholders materially misleading and inaccurate information through, *inter alia*, FirstEnergy's SEC filings and other public statements and disclosures as detailed herein, which failed to disclose that the Company was being operated in an unlawful and/or illicit manner. These actions could not have been a good faith exercise of prudent business judgment.

176.    Accordingly, to the extent any FirstEnergy exculpatory provision applies to the Director Defendants' acts or omissions while acting in their capacity as directors, it cannot immunize them from (i) any non-monetary liability; (ii) monetary liability for their breaches of the duty of loyalty; (iii) monetary liability for acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law; or (iv) monetary liability in connection with any transaction from which they derived an improper personal benefit. As detailed in this Complaint, the Director Defendants' misconduct with respect to the Ohio bribery scheme: (i) involved breaches of their duty of loyalty; and/or (ii) involved acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law. Any FirstEnergy exculpatory provision, therefore, cannot immunize the Director Defendants from liability for that misconduct.

177.    As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, FirstEnergy has sustained and continues to sustain significant damages.

178.    As a result of the misconduct alleged in this Complaint, the Director Defendants are liable to the Company.

## **COUNT II**

### **(Breach of Fiduciary Duty Against the Officer Defendants)**

179.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

180.    This Count is brought against the Officer Defendants solely in their capacity as officers of FirstEnergy.

181.    The Officer Defendants owed and owe fiduciary duties to FirstEnergy and its stockholders. By reason of this fiduciary relationship, the Officer Defendants specifically owed and owe FirstEnergy the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.

182.    The Officer Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, and loyalty by either intentionally causing the Company to issue false proxy statements or consciously ignoring numerous red flags related to the Ohio bribery scandal.

183.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

184.    Additionally, the Officer Defendants are not entitled to claim any immunity under ORC 1701.59(E) to the extent this claim is asserted against them in their capacity as officers of the Company.

185.    As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, FirstEnergy has sustained and continues to sustain significant damages.

186.    As a result of the misconduct alleged in this Complaint, the Officer Defendants are liable to the Company.

## COUNT III

### (Unjust Enrichment Against Individual Defendants)

187.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

188.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of FirstEnergy in the form of, *inter alia¸* salaries, bonuses, stock options, and/or other forms of executive compensation.

189.    Plaintiff, as a stockholder and representative of FirstEnergy, seeks restitution from Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants due to their wrongful conduct alleged in this Complaint.

## COUNT IV

### (Contribution and Indemnification Against Defendants)

190.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

191.    FirstEnergy is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein that give rise to Defendants' liability to FirstEnergy.

192.    FirstEnergy's alleged liability on account of the wrongful acts, practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Defendants as alleged above, and FirstEnergy is entitled to  contribution and indemnification from each Defendant in connection with all such claims that have  been, are or may in the future be asserted against, FirstEnergy by virtue of the Defendants' misconduct.

## COUNT V

**(Violation of Section 14(a) of the Exchange Act and
SEC Rule 14a-9 Against the Director Defendants)**

193.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

194.    This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. Plaintiff does not allege, rely on, or reference any allegations of fraud, scienter, or recklessness with regard to this claim.

195.    SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

196.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to shareholders which were contained in the 2018, 2019, and 2020 Proxies.

197.    The Proxies contained proposals to FirstEnergy shareholders urging them to elect and re-elect members of the Board and provide advisory votes on issues relating to executive compensation. These Proxies, however, misleadingly suggested that the Board maintained effective risk management and omitted any disclosures regarding (i) FirstEnergy's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately disclose a culture of complicity over compliance within FirstEnergy; and (iii) the fact that

53

FirstEnergy actually encouraged, and consistently rewarded, extreme risk-taking and illegal practices.

198. By reason of this conduct, the Director Defendants violated Section 14(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, FirstEnergy misled its shareholders by making misleading statements that were an essential link in shareholders following the Company's recommendations to re-elect and elect the current Board and to provide advisory votes approving of the executive compensation.

199. The false and misleading information contained in the Proxies was material to shareholders' decisions whether to vote in favor of the current Board and whether to provide advisory votes on executive compensation. Plaintiff, on behalf of FirstEnergy, thereby seeks relief for harm inflicted upon the Company as a result of the misleading Proxy Statements.

200. This action was timely commenced within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based, and in any case within three years of the date of each Proxy Statement.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully asks the Court for judgment against all Defendants as follows:

A. Declaring that Plaintiff may properly maintain this derivative action on behalf of FirstEnergy, that Plaintiff is an adequate representative for the Company, and that demand is excused as futile;

B. Declaring that the Individual Defendants have breached their fiduciary duties to FirstEnergy;

C. Determining and awarding to FirstEnergy the damages it sustained as a result of the violations set forth above from each Individual Defendant, jointly and severally, together with prejudgment and post-judgment interest thereon;

D. Directing FirstEnergy and Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from the recurrence of the damaging events described in this Complaint, including putting forward for a stockholder vote resolutions for remedial amendments to the Company's By-Laws or Articles of Incorporation, and taking such other actions as may be necessary;

E. Extraordinary equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the Individual Defendants' assets so as to assure that Plaintiff, on behalf of FirstEnergy, has an effective remedy;

F. Awarding to FirstEnergy restitution from each of the Individual Defendants and the group, and ordering them to disgorge all inequitable profits, benefits, and other compensation obtained;

G. Ordering an accounting of all compensation awarded to the Individual Defendants during the Relevant Period;

H. Awarding Plaintiff costs and disbursements related to this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

I. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trail by jury on all issues so triable.

Dated: November 12, 2020                           Respectfully submitted,


  /s/Shawn J. Organ
Shawn J. Organ (0042052)
*Trial Attorney*
**ORGAN LAW LLP**
1330 Dublin Road
Columbus, Ohio 43215
614.481.0901 (T)
614.481.0904 (F)
sjorgan@organlegal.com

Peter Safirstein (*Pending Pro Hac Admission*)
**SAFIRSTEIN METCALF LLP**
14 Penn Plaza, 9th Floor
New York, NY 10122
Tel: (212) 201-2845
Email:
psafirstein@safirsteinmetcalf.com

***Attorneys for Plaintiff Andrew Behar***